IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

   *Plaintiff*,

v.

DONWAND CUPPATINO HARMON,

   *Defendant*.

Criminal No. ELH-13-0296

**MEMORANDUM OPINION**

Defendant Donwand Cuppatino Harmon filed a pro se motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A). ECF 296. Thereafter, through appointed counsel, a second motion for compassionate release was filed. ECF 301. It is supported by a memorandum (ECF 303) and several exhibits. I shall refer to ECF 296, ECF 301, and ECF 303 collectively as the "Motion." The government opposes the Motion. ECF 309. It has also submitted several exhibits. The defendant has replied. ECF 312.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I. Background**

Harmon was one of six defendants charged in a seven-count indictment on June 11, 2013. ECF 1. In particular, he was charged in three counts, including Count One, which alleged conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin and 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

On December 6, 2013, Harmon entered a plea of guilty to Count One (ECF 108), pursuant to a Plea Agreement. *See* ECF 109. The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C),

by which the parties agreed to a sentence ranging from 198 months to 222 months of imprisonment. *Id.* ¶ 7.

The Plea Agreement included a Stipulation of Facts. *Id.* ¶ 6, 4-7. The Stipulation reflected a wiretap investigation. Between August 2012 until August 2013, defendant conspired to distribute more than one kilogram of heroin in Baltimore and Anne Arundel County. *Id.* Law enforcement completed a number of controlled bulk purchases of heroin "directly" from the defendant, *id.* at 4, or from his coconspirators. *Id.* at 4-5.

Pursuant to a warrant on June 13, 2013, law enforcement searched a motel room in Baltimore, occupied by defendant and a female. *Id.* at 6. From the defendant's motel room, the officers recovered $16,000 and 1.7 kilograms of heroin. *Id.* In addition, they saw the female dispose of a duffle bag, which they retrieved. It contained, *inter alia*, a holster and a loaded magazine for a Glock handgun. *Id.* The officers engaged in a foot pursuit with the defendant, but he eluded the officers. *Id.*

Then, on August 23, 2013, the defendant was arrested in Suitland, Maryland, pursuant to an arrest warrant. *Id.* A search warrant was also executed for the location, and it led to the recovery of over $10,000 and 205.5 grams of cocaine base, found in a kitchen freezer; a 20-ton shop press with kilogram and half-kilogram sized molds with cocaine and heroin residue, found in the dining room, along with over 1,100 grams of heroin; substantial quantities of cocaine and heroin found elsewhere in the residence, along with additional currency; multiple cell phones; false identification; multiple weapons and ammunition; drug tally sheets; and a duffle bag with a false bottom containing almost 4000 grams of cocaine.

Count One carried a mandatory minimum term of 10 years' imprisonment, with a maximum of life imprisonment. *Id.* ¶ 3. In exchange for the defendant's plea of guilty to Count

One, the government agreed not to file a notice of enhanced penalty under 21 U.S.C. § 851. *Id.* ¶ 9.

Sentencing was held on February 7, 2014. ECF 141. Harmon, who was born in 1976, was 37 at the time of his sentencing. ECF 123 (Presentence Report, "PSR"), at 1. He reported that he was taking medication for high blood pressure and a muscle relaxer due to his arthritis. *Id.* ¶ 94. He also revealed that he had been consuming alcohol and smoking marijuana on a daily based since the age of 12. *Id.* ¶¶ 95, 96.

The PSR reflected a final offense level of 34. *Id.* ¶ 38. And, the defendant qualified as a Career Offender because the instant offense involved a controlled dangerous substance and he had multiple prior felony convictions involving controlled substance offenses. *Id.* ¶¶ 36, 60. Thus, defendant had a Criminal History Category of VI. *Id.* But, even if defendant did not qualify as a Career Offender, he would have had a Criminal History Category of VI based on a total of 26 criminal history points. *Id.* ¶ 59.

Based on a final offense level of 34 and a Criminal History Category of VI, Harmon's advisory sentencing guidelines ("Guidelines") called for a sentence ranging from 262 months to 327 months incarceration. *Id.* at 20. However, as noted, the "C Plea" called for a sentence ranging from 198 to 222 months imprisonment. The Court imposed a sentence of 210 months, with credit for time served since August 23, 2013. ECF 143.

Harmon, who is now 43 years of age, is serving his sentence at FCI Yazoo City Medium. He has served about 89 months of his sentence, or roughly 42%. Harmon has a projected release date of November 19, 2028. ECF 303 at 2.

Harmon moved for compassionate release on September 16, 2020. ECF 303-2. He did not receive a response from the Warden and more than 30 days have elapsed since his request. ECF

303 at 2.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism

4

when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in

5

U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I)  suffering from a serious physical or medical condition,

6

> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t)

(directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. §

8

3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[1]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[2] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Although many people who are stricken with the virus

---

[1] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). And, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. As of January 31, 2021, COVID-19 has infected more than 26.1 million Americans and caused over 440,00 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 31, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines have primarily been made available to health care workers and the elderly in nursing homes, but recently the criteria for eligibility has expanded. That said, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease

10

Control and Prevention." *Id.* at 4. Therefore, once the BOP receives the vaccine, a prisoner at heightened risk will receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. According to a press release dated January 15, 2021, the BOP has administered 17,189 vaccine doses to staff and inmates at sixty-eight BOP institutions. *Update on COVID-19 Vaccinations*, U.S. Department of Justice, Federal Bureau of Prisons (Jan. 15, 2021), https://www.bop.gov/resources/news/pdfs/20210115_press_release_vaccination.pdf (last accessed January 19, 2021). As of January 15, 2021, 1,027 staff and 1,051 inmates have received a series of two doses. *Id.*

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY. According to the CDC, the factors that increase the risk include

11

cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.* The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently,

12

correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued

13

another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[3] As of January 31, 2021, the BOP had 123,221 federal inmates and 36,000 staff. And, as of the same date, the BOP reported that 3,117 inmates and 1,782 BOP staff currently tested positive for COVID-19; 42,671 inmates and 4,321 staff have recovered from the virus; and 210 inmates and three staff members have died from the virus. Moreover, the BOP has completed 101,224 COVID-19 tests. *See*

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

https://www.bop.gov/coronavirus/ (last accessed Jan. 31, 2021). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

At Yazoo City Medium, where the defendant is now a prisoner, as of January 31, 2021, the BOP reported that two inmates and six staff have tested positive for COVID-19 and 147 inmates and ten staff have recovered at the facility. And, the facility has completed 756 tests. There have been no reported inmate deaths. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 31, 2021).

### IV.  Discussion

Harmon has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 303 at 7-10. In particular, Harmon is obese, with a Body Mass Index ("BMI") of 31.1. *Id.* at 7. He also suffers from hypertension and asthma. *Id.* at 8; *see* ECF 303-2 (Medical Records). Moreover, defendant contends that he is not a danger to the community and that the factors under 18 U.S.C. § 3553(a) favor his release. *Id.* at 10-13.

The government asserts that there is no evidence that Harmon has suffered from asthma in the last three years and his hypertension "appears well-controlled with medication." ECF 309 at 17. But, the government concedes that at least one of defendant's medical conditions—obesity— would constitute an "extraordinary and compelling" reason for release. *Id.* Nevertheless, it argues that it "should not be a significant basis of relief" for Harmon because he is only slightly above the threshold for obesity. *Id.* In any event, the government maintains that Harmon is not eligible for release because he poses a danger to the community and the § 3553(a) factors militate against a reduction of his sentence. *Id.* at 18-24.

As indicated, Harmon's medical records show that he currently has a BMI of 31.3. *See, e.g.*, ECF 303-2 at 10, 45. The CDC identifies obesity as a COVID-19 risk factor supported by the

"strongest, most consistent evidence" drawn from multiple medical studies of the effects of the virus. *People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.

Numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions, including obesity and hypertension, qualify as compelling reasons for compassionate release. *See, e.g., United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Patterson*, TJS-20-1078, 2020 WL 2217262, at *3 (D. Md. May 7, 2020) ("There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19"); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity); *United States v. Daniels*, No. 19-00709, 2020 WL 181342, at *2 (N.D. Cal. Apr. 9, 2020) (finding severe obesity constitutes compelling reason for release).

Accordingly, I am satisfied that Harmon satisfies the "extraordinary and compelling" prong of the § 3582 analysis. This determination does not end the inquiry, however.

The Court must next consider whether, if released, Harmon would pose a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of

the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government urges the conclusion that Harmon is a danger, citing, *inter alia*, the seriousness of Harmon's offense and the defendant's prior criminal history. ECF 309 at 19-22. In particular, the government notes: "Not only was Harmon a leader of an extensive drug trafficking organization that used firearms as a part of it's [sic] business, not only did he flee from law enforcement, but he was continuing to traffic in large quantities of heroin and other drugs [after others were apprehended], and protect his operation with firearms, while using false identification to avoid arrest." *Id.* at 20-21.

As I see it, the factors under § 3553(a) and § 3142(g) do not weigh in favor of reducing Harmon's sentence at this time. The seriousness of this offense, coupled with Harmon's prior record, is particularly relevant to the analysis.

Beginning in 1994, at the age of 17, defendant was convicted of five drug distribution offenses, as well as a handgun offense, burglary, several trespasses, and assault. ECF 123, ¶¶ 41-54.[4] In 1996, in relation to the 1994 offense, defendant was sentenced to six years' imprisonment for possession with intent to distribute cocaine; he was released in 2001. *Id.* ¶¶ 41-44. A .357 handgun, 70 grams of crack cocaine, and over $4,000 was found during a search of his residence.

---

[4] The defendant was prosecuted as an adult for the 1994 offense.

*Id.* ¶ 42. In 2002, one year after being released, defendant was again convicted of possession with intent to distribute crack cocaine. *Id.* ¶ 46. He was sentenced to two years in prison. *Id.* He was also convicted in 2004 and in 2009 for drug possession. *Id.* ¶¶ 49, 54. And, he repeatedly violated probation and parole. But, his numerous convictions and time in custody did not deter defendant from committing the instant offense. It is also notable that defendant was unemployed from 2009 until his arrest in 2013. *Id.* ¶ 99.

Further, defendant's conduct over the past seven years, while in custody, is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020). In this regard, it is notable that Harmon has obtained numerous disciplinary infractions throughout his time in prison. ECF 309-4 (Disciplinary Record).

Moreover, the defendant has only served about 42% of his sentence, exclusive of good time credit. And, his sentence was significantly below the Guidelines range.

Given the serious nature of the underlying offense, coupled with defendant's prior criminal history and the abbreviated time that defendant has served to date, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

## V. Conclusion

For the foregoing reasons, I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: February 2, 2021                              /s/
                                        Ellen Lipton Hollander
                                        United States District Judge